Dean Fryer, Illinois Appellate Court, 2nd Division, Inbound Session. Honorable Justice Michael Eichmann presiding. Please be seated. Morning. Madam Clerk, please call the first case. 14-1667, Mitchell v. Armando. Counsel, please step forward. Please state your name and approximately how much time you'd request. My name is Kathleen Reck, Assistant Appellate Defender for Armando Fernandez and the usual 10-15 minutes should be fine. Thank you. Good morning, Justice. Assistant State's Attorney Jesse Gouth on behalf of the people. 10-15 minutes. Thank you. Once again, good morning, Your Honors. Counsel and Kathleen Reck representing Armando Fernandez. And if I could reserve two minutes for rebuttal, that would be. Thank you very much. I plan to focus on both issues raised on appeal, but will of course be happy to answer your specific questions related to either of the issues. First, the evidence is insufficient to sustain Armando's convictions, even when that evidence is viewed in the light most favorable to the State. In a construction possession case like this, the State had to prove Armando's immediate and exclusive control over the premises where the drugs and weapons were found and his knowledge of the hidden contraband. With the control element, the evidence in this case is scant, particularly over the detached garage where all of the heroin and all but one of the weapons was found. The police found no mail address to Armando. He had keys, didn't he? According to the police, he had keys. That's disputed. Around the garage in the house? Yes. He had a set of keys. We're not disputing that he may have visited the house or had access to it because there is his passport and an insurance card, neither of which presumably lists his address. There's no actual proof of residency there. And he made no admission to living there. There's photographs in the house of him, but it's all of them, according to the record, appears to have been with a woman. This bedroom where the gun is found hidden under a mattress contains men's clothing, but also women's clothing. And there's another man in the house also. Also, the police said that there was no other people. You're referring to the butler? The butler. Of course, this is all being hearsay about what the butler may have said. Now, the search warrant was just for the first floor of the residence. This is a house with a second floor and a basement, according to Google Maps, which I looked at. And so we don't even know. There's nothing to indicate. They checked out the rest of the house to see how many people may have actually been living in this house. And this is assumably a relative's house, also, where people may be assumed to have access, perhaps to go in and visit, you know, feed the dog or whatever. The search warrant was only for the first floor? Yes, that's what the search warrant says. One was for the first floor of the residence, and one was for the detached garage. And the testimony is the gun was found on the second floor? No, there's no evidence about a search of the second floor or the basement. But do we know where the gun was found? The gun was found in a bedroom on the first floor under a mattress. Okay, the evidence shows that he has access, but there's even fewer ties to Armando to the garage except for his key. Why do you concede access? Pardon me? Why do you concede that the defendant had access? Well, if we're looking at the light and the light was favorable to the state, the evidence, then a set of keys presumably could give someone access to the house. That, you know, of course, this is very odd in this case, as the defense attorney argued at trial, in that the police forced entry to the garage and the house, and there's some dispute about whether the evidence report indicated that the keys were actually found in the house. So there's a question about this. Wasn't that an issue of fact for the trial court to resolve? Assumably, Your Honor, yes. You argue that he did not reside at the Kedvale address, that his address was someplace else, and you introduce mail to that effect. So why, if the police had the other address, and that was the address in his arrest report, why would they assume the keys on his person would open another home and garage? Well, I suppose that's a good question to ask, but they didn't try them. Well, do they have to try the lock with the keys before they can force entry on a warrant? No, it just seems like a curious fact in this case. There's a lot of curious facts in this case, one being the fact that he is convicted of possessing not only this weapon in this bedroom where his passport is found and an insurance card, and also women's clothing, and there's another man in the house, but also the fact that he's convicted of possessing all of this evidence contraband hidden in the garage when there's no evidence that he didn't make any admission to living in this house. The stipulated evidence from the defense is that he actually lived in 1850 North Kedvale or at least received his mail there, and that was what was on his driver's license also. So no one has ever testified to seeing him inside that garage at the trial. The evidence is just absent. Or inside the house. Or inside the house, correct. This court's decision in Maldonado is instructive because there, as in this case, the evidence was seized during the execution of a search warrant when the defendant was not present, and the proof of residency was very weak in that case. There was two pieces of mail and a delivery receipt, and here there was not even any mail or any proof that he actually had any residence in that house. Do you think this is a stronger case than Maldonado? In some ways, yes, because there's no mail or actual proof of residency. From that extent, yes. And as for the knowledge element, I think Maldonado is also instructive on that point because this court held in Maldonado that even if there was evidence that the defendant controlled the premises, there was no proof whatsoever that he had knowledge of the drugs hidden in the statue in the bedroom. And likewise here, all of the contraband was hidden. This gun is found under a mattress. It's not found in the dresser where his passport is. It's not on an open. It's hidden. And certainly everything in the garage is hidden, just like the drugs in the statue in Maldonado. If the gun was on the dresser, would your position be different? I think the fact that it's hidden, if it was with his passport, there might be perhaps some connection. But there's another case. It wouldn't necessarily be different. Alicia, which is a case also discussed in Maldonado, there was actually a U.S. Treasury check addressed to the defendant in the dresser or on the dresser in the room where the gun was found, and that still is not considered enough to connect the defendant to the premises. So here, particularly when there's weapons and drugs in the garage and there's no proof introduced that he ever even entered that place or had control over it, where is the registration for the car? Were the fingerprints done? I mean, the evidence is just so scant in this case that we are asking this court to reverse its convictions for possession of weapons and the heroin. If you agree with us on this issue, then there's no need to reach the second issue. But, however, our second issue is that Armando is entitled to a Franks hearing because it made a substantial preliminary showing that the police officer obtained the search warrant through the knowingness of false information and with reckless disregard for the truth. As a preliminary point, when the trial court judge denied the motion for a Franks hearing, she said the motion fell outside the scope of Franks because the informant appeared before the judge, who issued the warrant. But as the Supreme Court clarified in Chambers, the informant's presence at the hearing on the warrant application does not foreclose the possibility of a Franks hearing. But it's relevant. It could be relevant, but it does not foreclose it, as Judge Patron seemed to believe it did after Franks. In this case, this warrant... Are you saying the failure to exercise her discretion was an abuse of discretion? Because she didn't recognize that she had the discretion? She didn't recognize she had the discretion, but, of course, this court's review now is de novo, so it's just an interesting point when considering the evidence as your de novo review that one of the bases that she denied it was has been overruled by Chambers. In this case, the affidavit was based entirely on the information from a confidential informant whose reliability was unproven. Is it at all relevant that the informant tells the police officer that the drugs in the garage are in a hidden and pretty unusual place under the hood of an inoperable van, and, in fact, that's where they are? Isn't that relevant in determining whether there was knowing falsehood here? That's not relevant when the point comes before they've executed the warrant, because, for all we know, this informant is actually someone that owns these drugs under the car. But in terms of the courts looking at whether the defendant has made the preliminary showing necessary to warrant a Franks hearing, you say this informant was untested, there's no information that the informant was reliable, and yet the information that the informant gave the police turned out to be true. Your Honor, I'm not familiar with the case in which it's said that the fact that the evidence was found where the informant said it was is a reason that a defendant cannot challenge the Franks hearing motion at all. We're all basing it on what happened with the police officer going before the magistrate judge. So the reliability, the corroboration needs to be of the illegality, as I'm understanding Chambers, at the time when the police officer takes this informant in front of the judge. In this case, we don't know anything about this informant, and Armando is alleging that the informant lied to the police and that the officer fabricated facts or recklessly disregarded the truth, particularly by relying on the informant's information that Armando lived at, that Keating House, and the CI met him there. So Armando revered in his affidavit that he had always lived at 1850 North Kedvale, not the place where the search warrant was executed, and he had never lived at South Keating in the attached exhibits, including mail and his driver's license, to show that he lived at Kedvale. He said he was not even in Chicago on May 15th until shortly before he was arrested at 6 p.m. in the area of 2738 West Evergreen, which if this court could take judicial notice, is about nine miles away from the Keating residence. He said he got here around Chicago at around 4 o'clock. No, he said he left Kenosha at 4 o'clock. So Kenosha is about seven miles away, and this is during a rush hour on a Friday. Well, but that information, that argument, I didn't see it in the record made to the trial court. I saw the information that I left Kenosha approximately 4 o'clock. Given the distance between Kenosha and Chicago, I couldn't have gone to Kedvale and then on Evergreen in time to be arrested at 6. I didn't see the argument you're making now, which is a more detailed argument. Right, but again, if this court's review is de novo, it's— De novo means we do what the trial court did. It doesn't mean you get to supplement the record and appeal with different arguments. Well, I also believe—I mean, I'll look back, you know, before I come up for rebuttal, but I believe that the judge did address the fact that she didn't think that the fact of the distances involved or the time he left would absolutely foreclose the possibility that he could have met with the CI and gone to Evergreen in that time period. I'm just saying that it's practically improbable. What's in the record that says that it practically implies? What's in the record that says that? I think just taking notice of the distances involved and the time on a Friday afternoon at 4 o'clock to get all the way through rush hour traffic in Chicago. But we also have these affidavits supporting that he was in Kenosha and he left around 4 from his grandmother and his sister, who would be open for perjury if they were lying about this. And he also has affidavits from his aunt, who lives in the house, saying that she was there all day in Keating and did not see Armando at the house. And the cousin, I believe, also says that he does not have keys to the house. So we have four people besides himself stating why this warrant application, the CI's information to the police officer, was a deliberate falsehood where the police officer depended on it with reckless disregard for the truth. Do you know what time the search warrant application was issued by Judge Ford? It was close to midnight. So on the 15th around 6 o'clock, they see the defendant exit a vehicle with a softball-sized object in his hand that later is determined to be heroin. They chase him. He gets away. They go to the car he exited and find, in plain view, two softball-sized objects containing heroin. A woman, whose picture is later found in the same house that the search warrant is executed. They search, they catch the defendant, search him, find heroin on his person. Right? Well, respectfully, I don't know what your reaction would be, but the substance that was taken from him was never tested. Well. Presumably. Presumably. But they arrest him, put him in the station, charge him. Then later that evening, right? Correct. They get the search warrant and then search the house. Yes. Okay. Yeah. That's the timeline involved. And, of course, in the warrant application, there's the complaint for it. There's no description whatsoever of what time the CI was allegedly meeting with Armando at the house. So. And he was never prosecuted for the events at the automobile, I think? He never was prosecuted for it, and they never tested that substance that was seized, which is odd to me, a little bit, that they would not bother for this separate amount. But anyway, our position is that Armando deserves a Franks hearing to prove that there was a reckless disregard for the truth or deliberate falsehoods at the heart of the court's finding of probable cause for the search warrants, and the state would clearly not meet the probable cause standard without the complaint for the search warrant. If this court does not vacate his convictions outright, we ask you to remand for a Franks hearing. Thank you. Thank you. Counsel, can I have your name again, please? Yes, Justice. Jesse Gouth, G-U-T-H. Thank you. May it please the Court. Counsel. Justice, I'd like to start with the sufficiency of the evidence argument regarding constructive possession. Now, when that search warrant was executed at the teething address, the officers had previously in the day recovered keys from the defendant. Officer Delaney testified at trial, and this court can look at the light from trial and the light most favorable in people. Officer Delaney testified that as a result of a custodial search inside the police station, he recovered a set of keys from the defendant. At that time, close to Miranda, the defendant also stated that he sold heroin, that the drugs in the car were his, and that he could offer the police $50,000 if they let him go. Now, when they executed the search... But that was not written down, right? That was what was testified to by Officer Delaney. The officer remembered that, but he didn't include it in any report. That's true. Did he ever charge a bribery? No, Your Honor. When the officers entered the premise, they did do a safety sweep of the premise, and they did determine no one else was home. They executed the search in the bedroom. But they did find the butler. They did find the butler. However, they spoke with the butler very briefly. He stated that he was the butler, not otherwise identified, and there's nothing else in the record regarding the butler. I mean, do you know? It just seems kind of strange. They go there at what time? They go there at 1 a.m. on May 16, 2000. And they find somebody in the house, and he tells them, I'm just the butler, and they say, okay, go back to bed. At the time they're executing the warrant. Strange. They're executing the warrant. He's in the house. He's not doing anything wrong. Just because you're at a house where contraband is subsequently found doesn't mean you're doing anything illegal. The reason why the firearm in the house was charged to the defendant was because he was a felon. So he was charged with UUWF. Was the defendant in the house? Defendant was not in the house. Defendant wasn't in the house when they executed the search. Was he ever in the house? Defendant had keys to the house. Was the defendant ever in the house? Is there any evidence that that man was ever in that house? In the bedroom, there's a plethora of evidence that he was in that house. Is there any evidence that that man was ever in the house? What we have in the record is that the defendant's insurance card, Blue Cross Blue Shield insurance card, was found on the TV stand. His passport was found in the dresser. Photographs of him and his girlfriend were affixed to the wall. The same woman that was found in the vehicle where the heroin was found, that the defendant admitted to selling, that the defendant admitted was his, that the defendant admitted that he could have $50,000 to bribe the police officers with. So your answer to my question is no. There's evidence in the house that the defendant had been there due to his passport being there, his insurance card, photos of him. Could the defendant have given his passport to the woman to hold for him? Is that possible? In the light most favorable to the people, Your Honor. Is that possible? That's... His insurance card. Is it possible that it could be in the possession of someone other than himself? Is it possible that someone's photograph could be in a location without that person ever being in that location? It's possible that someone in extremely out of the ordinary, that such a personal item such as a passport, a Blue Cross Blue Shield insurance card found in the bedroom where the TV screen is, mail clothing, passport found in the dresser, which is a very personal item. Whose clothing was the mail clothing? Who did that belong to? That's not identified in the record, but given reasonable inferences in the light most favorable to the people, based on the fact that it was found that the defendant did reside there, that there was plenty of evidence of that. Wait, what's the evidence that he resided? There's evidence of habitation insofar as his clothing being there. You said there was no evidence of whose clothing it was. There's no evidence. You can't say it was his clothing. While it's true that it was never identified as his clothing, what we do have mainly... It was the butler's clothing. He was a male. While it's true the butler was found present there, what we do have is the defendant ultimately had keys to that house. He had keys that were tested by Officer Delaney that he said engaged and disengaged, not only in the front door, but also the detached garage. That is control. Knowledge can be inferred based on... Has any case said a defendant's possession of keys to a structure standing alone is enough to charge him with constructive possession of the contents of the structure? While argued in our briefs, we cite to people v. Cunningham, which did have additional facts outside of just the keys. There was his driver's license and mail in Cunningham. However, taking back that while mail is not dispositive, as people v. Alicia stated... I'm making the distinction between the home where the police found something with his name on it, not necessarily his dress, but a passport, an insurance card, and the garage. The garage, all you've got is keys, right? We've got two things. We've got the fact the defendant had keys to that garage. In addition to that, the .380 caliber firearm that was found in the bedroom under the mattress, there was .380 caliber ammunition found under the hood of the inoperable van, right next to the air arm, right next to the two .357s, right next to the .32. So taken together, in the light most favorable to the people, we do have that the defendant had the requisite control over both, not only the house, but also the detached garage. In addition to, as far as the garage goes, he had the control over that with the keys, as well as the .380 caliber ammunition matching the .380 firearm found within the house. Do you agree with Ms. Wett that it's a little unusual that the police, seeing a hand-to-hand transaction take place, softball-sized bag of presumably narcotics, didn't charge him with that or even test it? While we're not here to second-guess the actions of the police officers then, what they did do is they were armed with a warrant, which when you look at the evidence used at trial, which this court may use to affirm a pretrial ruling for the Franks issue, the officer used all the evidence that he had learned from that transaction. He had observed a hand-to-hand transaction attempted to take place. He had heard the defendant state that he sold heroin, that the heroin was his, and he had $50,000 to bribe him. Armed with this information, he then went and met with a confidential informant who testified exactly to what the contents were in that garage. The people had no evidence. The question is, though, I see indictments all the time. You've got 15 counts, and they include everything that the defendant is accused of doing. And I'm just curious, it seems curious, that he wasn't charged with this substance in his possession. While he wasn't, it's true, he was not charged with the heroin found on him, which was two small baggies in the gear shift as well as a few baggies found on his purse. Softball size. Correct, Your Honor. However, he was charged with the firearms found during the search. He was charged with the 1,000 grams of heroin found in the search. And when you look at, turning to the Franks issue, when you look at all the steps that Officer Junkovic did to corroborate, there is absolutely no evidence here that the defendant has made a substantial preliminary showing that Officer Junkovic acted with a reckless disregard for the truth. There's no evidence here that he should have had serious doubts about the warrant. When you look at the evidence induced at trial. What about the fact that from 4 o'clock in Kenosha to South Side of Chicago, at that time of day, any day of the week, particularly on a Friday, two hours is beyond comprehension, isn't it? While it's true that the defendant has submitted affidavits that may go towards his innocent or guilt, that's not the purpose of a Franks hearing. The purpose of a Franks hearing isn't to just simply view the affidavits and look at whether or not the defendant has an alibi. When you look at the case law developed in Illinois, such as under Chambers, under CARA, which this court wrote, you can look at the fact that there was a substantial preliminary showing in both of those cases that the officer had acted with a reckless disregard for the truth. Such as in Chambers, you have a confidential informant, Myles Copeland, coming forward stating that he was strung on by the police officers and forced to lie under oath and that the officer knew that and had acted with a reckless disregard. In CARA, this court found that there was a substantial preliminary showing with affidavits, but also the fact that the officer had never corroborated any of the information in CARA for the confidential informant. The officer there had never conducted a controlled ball by any surveillance, didn't run the confidential informant's name through other police departments. Here, Officer Junkovic had three very important things that show his corroboration that goes to show that he didn't act with a reckless disregard for the truth,  Here, Officer Junkovic, prior to the warrant, had information that the defendant had admitted to selling heroin, that he was going to bribe the police officers, that the heroin in the vehicle was his. In addition to that, he had a confidential informant step forward and say, I spoke with the defendant, and in the warrant it says that the defendant admitted to him, the confidential informant, that he sold heroin, and every person he sells it to loves it. In addition to that, the confidential informant's accuracy and degree of description all fit. The confidential informant specifically identified exactly where the heroin would be in the inoperable van in the garage, where it was hidden, in addition to the fact that Officer Junkovic then took a photograph of the defendant and a photograph of the residence, and had the confidential informant identify that. All of these factors taken together show that he did not act with a reckless disregard for the truth. While I understand your question regarding the affidavits, as far as whether or not we should believe them, that isn't the purpose of the Franks. You look at me, my questions aren't asked for the affidavits, my questions go to the proof beyond a reasonable doubt. So, you can address that with Justice Mason. I apologize, Justice, I was simply looking. Okay, that's all we have. Whereas, the entire purpose of Franks is to show that the officer, the government affiant, acted with a reckless disregard for the truth, that he was dishonest. The purpose of Franks is to curb police misconduct, to curb police misconduct through the exclusionary rule for Fourth Amendment violations. Here, there's absolutely no allegation of dishonesty or reckless disregard by Officer Junkovic. He took all the necessary steps to corroborate that weren't present in Chambers, that weren't present in Caro, and the confidential informant was presented to the judge for questioning, which under Chambers is still a fact to reconsider. The judge form is still able to make an assessment of the credibility of that confidential informant. Taken with all the other steps that the officer did, there has not been a substantial preliminary showing. There is a presumption with validity to search warrants. If I may circle back to one thing on the constructive possession argument. Overall, in the light most favorable to the people, when you look at the fact that the defendant had made those admissions to the police officers, in addition to the fact that he had exercised control over the premise, and when you're looking at the knowledge aspect, you can look at the defendant's acts, and here we have the defendant made those admissions that he sold heroin, and that he had $50,000. When the defendant was ultimately found guilty, there was enough there to establish his control, knowledge, and possession, and intent to deliver. Well, let's assume I accept that as to the drugs at the location of the search. How does any of that impute to his knowledge of a gun in the residence? What's your evidence of that? The site, the keys, his passport, and his insurance card. Keys, passport, and insurance card taken together, along with presence of, when they find large, you just want to know about just the firearm in the house, or can I move that if you look at the firearms in the house? The firearm in the house. The firearm in the house, what we have is that the defendant exercised control over that location with the keys that were tested, and that his insurance card was found there, and his passport was found there. That is the evidence that shows him as having control over that bedroom and that firearm in particular. If a stolen stock certificate or a stolen bond worth $100,000, if the bond certificate had been stolen the day before, and that bond was found underneath the mattress, would the fact that the defendant's passport and insurance card and the keys to the location, would that be enough to impute knowledge to him that he was recently in possession of recently stolen goods so you could charge him with felony theft? Would that be enough? In that scenario, no, Justice. However, here, knowledge is often susceptible to circumstantial evidence. So what's the difference between knowledge of a stolen stock certificate and knowledge of a weapon both found in the same location? The knowledge of a weapon here is different in the fact that the defendant had keys to this area. There was all of the evidence that he essentially lived or slept or had been in that bedroom. In addition to that, the firearm was stored right below, right below. He slept on top of it. And that was the same firearm, the .380 caliber firearm, that those same .380 caliber shells were found in the detached garage that he had control over. This is the same defendant that specifically stated, and evidence was adduced at trial, that he sold heroin. And he had been lying to us. He stated he sold heroin, that it wasn't his girlfriend's, and that the drugs in the vehicle were his. And that he did not live at that location, right? So we're not going to accept that part of the statement, according to your evidence. You don't have to live at a location in order to constructively possess something there. While I agree there are certain facts in this record that go against the habitation aspect, whether or not he specifically lived there, what we do have here is evidence that it's possible, and what most favorable people, I would argue, that we've met that. But in addition, the primary evidence here is that the defendant exercised control over this. And in Maldonado, the case is distinguishable there. They had two pieces of mail, two pieces of junk mail, and the drugs were found in an enclosed statute. There was a weapon found there, too, in Maldonado. The primary evidence that Maldonado discussed was the cocaine found in, or the heroin found in the enclosed statute. And the weapon. And the weapon. However, that's all the people presented was that they found, was that the court ultimately found that there was only just very, they looked at the control aspect and the knowledge aspect. They said that the pieces of mail were not, one piece of mail was not dispositive under the Alicia case, and that there just wasn't enough there, even in the light most favorable of the people. But here we have two pieces of paper with his name on it, right? That's it. That's all we have in that room. But we also have. We don't know what else. You know, maybe other mail. The butler may have stuff in there. Maybe the butler's clothes. The butler lives in the house. I mean, if he wanted to hide something, he wouldn't want to hide it in his own room, would he? I mean, so we don't know who could have hid that. And we don't know how, what by habitation, I mean, how long does this guy have any evidence that he sleeps there at all? What distinguishes this case, however, from Maldonado is the defendant's keys to the residence. And that is a major determining factor of control. And then the keys show control. And knowledge can be inferred from the different circumstantial evidence that we previously discussed. Let me just observe one other thing. To get the search warrant, the officer showed a picture of the house that he obtained from the Cook County Assessor's website, correct? Yes, Justice. Which tells me that the officer also has knowledge that if he went to the Cook County Collector's website, he would have gotten the name of the associate record or the person to whom the taxes were assessed for that location. Typically, that would be them. It's not here. There's no utility bills. There's no gas bills. There's no cable TV bills. Nothing. Identifying this location to this defendant. They had six years. Six years between the arrest and the prosecution. Now, I would assume that a diligent prosecution would have attempted to do a better job to connect the defendant to this location. Is that not a fair surmise? Respectfully, Justice, in the light most favorable to the people for the constructive possession aspect of this case, looking at the, while I've seen the inconsistencies that you brought out insofar as the habitation, I would still ask that you consider the passport, the Blue Cross Blue Shield insurance card, as well as if you look in the exhibits containing the record, two through six, and look at the photographs that were affixed to the wall of the defendant as well as his girlfriend. In addition to that, the fact that the defendant had keys to this specific building, and that essentially shows the defendant's control over this building, control over the detached garages, officer's delaying testimony, that the keys disengaged and engaged the locks, went unimpeached throughout trial. Taken together with that, as far as, in addition to the .380 caliber firearm found under the mattress, matching the .380 caliber shells found in the exact location where they weren't matched, taking that together in the light most favorable to the people, we have met our burden on appeal in the light most favorable to the people that the defendant is guilty of constructive possession and intent to deliver. If there's no more questions, for those reasons argued here and the reasons in our brief, we ask that you affirm the trial court's denial of a Frank's hearing, as well as affirm the defendant's conviction and sentence. Thank you. Thank you. May I please support? Again, your honors are correct. There is no actual evidence that Armando Fernandez was ever in the house. They have not come up with any person to ever say he was in the house, never in the garage. There are a few pieces of documents, the passport and the insurance card, that have his name on them. He standing alone was, I believe, Justice Mason's question, has that ever been enough? The Cunningham case, upon which the state relies, which I discussed in the brief, that's very distinguishable. The defendant had given that address out to his parole officer, and his inmate card is also in this locked bedroom, and there's mail delivered to him at that house. So that is nothing like the facts of this case. The best the state can come up with to show that Armando has any kind of knowledge, their knowledge element for all of the contraband in the garage that is hidden, is that this caliber of ammunition is the same as a gun that's hidden under a mattress, and we don't know what brand this was, we don't know if it's the same brand. It's a common caliber that standing alone cannot possibly be enough to connect him to this. But Mr. Duff was also relying on the statement that he made to the police officer that he sells heroin. Well, if he says he sold heroin, that doesn't mean he sold that heroin. It doesn't mean he's connected to that. That's surely not enough to prove him when you don't even have enough evidence of control, immediate and exclusive control of the garage and the premises, and to show that even if he did say that in the light most favorable to the state, that he has any connection to whatever's found in the garage, which brings back to the whole nature of this case. There's no evidence that this person who supposedly made an anonymous call about some gold car with Wisconsin plates being at a certain location at 6 o'clock was the same person who was the CI. I mean, this evidence is just, there's a lot of gaps here. And as far as, I think Justice Mason will also ask about the judge's ruling about the time frame. The judge does, of course, clearly just base it on the fact that it's outside the scope of Frank's, but she does say that the approximation of the time he left Wisconsin does not contradict the informant's claims because we don't know when the informant was there at the house. But again, with the distances involved, when the conditions for a Frank's hearing, which is a pleading stage, it's more than mere denials, which we have here. We actually have the offer of proof. We actually have affidavits. But your position is not that it was impossible for him to have been at the address with the CI and later at Evergreen when he was arrested. Your position is, and was in the trial court, that it was improbable. And given the purpose of Frank's, I'm not sure that's enough. You know, we have factors about how fast does somebody drive. But we do have rush hour traffic. Yesterday I actually went on to MapQuest at 4 o'clock on a weekday, and it said it would take an hour and 40 minutes to get from Kenosha to Keating, and it would take another 20-some minutes to get to Evergreen. So here we have two hours right there. So if this was going on, it didn't sound like, according to the informants, what he said to the police officer, that this was a two-minute operation whenever he was meeting with Armando. And we also have the fact that the aunt is there, and she says she didn't see him there. So we have more than just a mere denial. We have offers of proof showing why this application for a search warrant was made. And all we're asking is for a Frank's hearing to get to the bottom of what exactly was going on here. If you want us to not have any further questions, we ask you to review this conviction outright or alternatively, we'd be in for a Frank's hearing. Thank you very much. Thank you. Thank both counsel for your prepared arguments. You did an excellent job. We'll take the case under advisement, and we'll recess before we call the next case. Thank you. Thank you.